IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MELANIE S. BADEN,               )
     Plaintiff,               )
                              )
     vs.                      )     2:05cv0855
                              )     **Electronic Filing**
JO ANNE B. BARNHART,            )
COMMISSIONER OF SOCIAL          )
SECURITY,                       )
     Defendant.               )

## MEMORANDUM OPINION

### I.    INTRODUCTION

Plaintiff, Melanie S. Baden, brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Commissioner") denying her application pursuant to the Social Security Act ("Act") for Disability Insurance Benefits ("DIB"). Presently before the court are cross-motions for summary judgment. After careful consideration of the decision of the Administrative Law Judge ("ALJ"), the memoranda of the parties, and the entire record, the Court finds that the decision of the Commissioner is supported by substantial evidence. Accordingly, the Commissioner's motion for summary judgment will be granted and Plaintiff's motion for summary judgment will be denied.

### II.    PROCEDURAL HISTORY

Plaintiff protectively filed an application for DIB on August 29, 2002, alleging disability as of December 31, 2000, due to bipolar disorder and depression. (R. 15-16). Her claim was denied by the state agency on May 5, 2003, and at Plaintiff's request, a hearing was held before Administrative Law Judge Raymond J. Zadzilko on November 18, 2004. (R. 15). Plaintiff, who was represented by counsel, testified at the hearing. (R. 37). Mark L. Heckman, a vocational expert, also testified. (R. 59). On January 18, 2005, the ALJ issued a decision in which he determined that Plaintiff was not disabled. (R. 22). On May 11, 2005, the Appeals Council

1

denied Plaintiff's request for review, and the ALJ's decision became the final decision of the Commissioner. (R. 7).

Plaintiff then filed her complaint in this Court on June 21, 2005. On November 18, 2005, Plaintiff filed a motion for summary judgment. On December 14, 2005, the Commissioner filed a motion for summary judgment.

## III.    STATEMENT OF THE CASE

Plaintiff, who was born on May 16, 1953, was 51 years old when the Commissioner's decision became final. (R. 7, 103). She was five days away from her 52nd birthday. She graduated from high school, obtained a two-year Associate's Degree in Business Administration from Community College of McKeesport, and engaged in an additional four-month program in business administration subsequent to her degree. (R. 39-40). Between November, 1993, and February, 2003, Plaintiff held several jobs. During this period of time, she worked as a telemarketer, a bookkeeper, a deli clerk, a census enumerator, a day care worker, and an office assistant. (R. 116, 139). Plaintiff was working as an office assistant for a social worker at the time of her hearing. (R. 45-47).

From January 28-February 5, 1996, Plaintiff was involuntarily hospitalized at Westmoreland Regional Hospital pursuant to 50 Pa.C.S. § 7302. (R. 156). The record indicates that Plaintiff was committed after engaging in "bizarre" and "inappropriate" behavior at a Giant Eagle grocery store in North Huntington. (R. 156). At the time, Plaintiff indicated that she had a history of bipolar disorder, that her husband's alcoholism and seizures had strained their marriage, that she was fearful of losing her home, that she had chronic financial problems, and that she had experienced auditory and visual hallucinations. (R. 156). She feared that she would lose her home in a sheriff's sale because she had not paid the mortgage for several months. (R. 165). Her medical records indicate that she had previously been hospitalized at St. Francis Hospital for bipolar disorder. (R. 156). These prior hospitalizations occurred in September, 1991, and October, 1993. (R. 156).

Dr. Donald Breneman, a psychiatrist, treated Plaintiff during her 1996 hospitalization.

2

She was put on Lithium and a low cholesterol diet. (R. 158). Dr. Breneman reported that, during Plaintiff's hospitalization, her global level of functioning improved from 28 to 50. (R. 159). Upon discharge, Plaintiff was instructed to follow up with outpatient care. (R. 159).

Plaintiff proceeded to seek outpatient care from the Comprehensive Counseling Center at Westmoreland Regional Hospital. (R. 193-208, 247-250). Apparently, there were some instances in which Plaintiff did not take her medications. (R. 208). The record indicates that she sometimes forgot to take her medicine, and that there were instances in which she avoided taking it for fear of side effects. (R. 208). Plaintiff also received counseling services from Catholic Charities, an organization affiliated with the Catholic Diocese of Greensburg. (R. 214). She was seen for counseling on "issues relating to parenting, co-dependency due to living with an alcoholic, and improving her stress management and self-care skills." (R. 214). She was discharged from this counseling on March 23, 1999. (R. 214).

On October 24, 2000, Plaintiff returned to the Comprehensive Counseling Center. (R. 190-192). Her case there had been closed the previous June because she had ceased contact with the Center. (R. 191). Apparently, she had failed to respond to a letter which indicated that her case would be closed unless she contacted the Center by May 26, 2000. (R. 193). After returning to treatment in October, 2000, Plaintiff was evaluated by Dr. James W. Millward and Cheryl Millward, R.N.C., B.A. (R. 191). They noted that Plaintiff's mood seemed stable but that she had not had any blood work done in over a year. (R. 191). Although Plaintiff appeared to be happy remaining on Lithium, they determined that it was necessary to obtain blood test results in order to confirm that she should continue taking the drug. (R. 191). On October 31, 2000, a report was completed which indicated that Plaintiff had not been truthful about how she had been obtaining Lithium. (R. 189).

Plaintiff alleges that she became disabled on December 31, 2000. (R. 16). Her father had a stroke on that day, and he passed away on March 31, 2001. (R. 75). On May 14, 2001, two months after her father's passing, Plaintiff indicated that she was satisfied with her medications and that she did not seek any changes in her prescription. (R. 182). She dropped out of treatment after her August 17, 2001, appointment. (R. 173). This was a result of Plaintiff's

3

depression. Plaintiff returned to treatment on October 11, 2002, alleging that her depression was "going into a manic phase." (R. 173). This visit occurred roughly one and a half months after she protectively filed for DIB. During the months that she went without appointments, Plaintiff also went without medication. (R. 173, 178).

On January 20, 2003, Plaintiff was evaluated by Dr. Millward. (R. 173-175). Dr. Millward reported that "[t]here was no evidence of a formal thought disorder, delusions or hallucinations, suicidal ideation, or homicidal ideation." (R. 174). Plaintiff's global assessment of functioning score at that time was 45, and her bipolar disorder and depression were deemed to be "in partial remission." (R. 174). She did not want to go back on Lithium because it had given her diarrhea, and she indicated that her depression had improved in the absence of medication. (R. 175). For this reason, Plaintiff opted to remain medication-free. (R. 175). She did, however, schedule a follow-up appointment for March 10, 2003. (R. 175). When she arrived for that appointment, she explained that she was frustrated with her living arrangements. (R. 170-171). She was living with her sister-in-law, nieces and nephews. Depakote was prescribed for her. (R. 171).

On April 29, 2003, Dr. Edward Zuckerman, a state agency medical consultant, found Plaintiff's statements concerning her limitations to be only partially credible. (R. 234). Although he indicated that Plaintiff's depression would likely decrease her level of concentration and her productivity, Dr. Zuckerman did not believe that her mental impairments were severe enough to preclude her from engaging in substantial gainful activity. (R. 234).

On March 24, 2003, Plaintiff reported that she was homeless and that she was seeking public housing. (R. 244). At this point, her daughter was staying with a friend. (R. 244). Plaintiff apparently left her home because her niece had been disrespectful and intrusive, leaving Plaintiff depressed and tearful. (R. 245). Records from the Comprehensive Health Center indicate that, on April 10, 2003, Plaintiff was living in a new apartment. (R. 244). Although she expressed an interest in working again, she was under the impression that her mental health issues were seriously complicating her efforts to maintain employment. (R. 244). Four months later, it was noted that Plaintiff's medications were working and that she was maintaining limits

4

with her family. (R. 240).

In May, 2004, Plaintiff was evaluated by Dr. Amit Goulatia. (R. 277-278). She was referred by her primary care physician, Dr. Clark Kerr. (R. 277-278). Dr. Goulatia was left with the impression that Plaintiff suffered from "moderately severe obstructive sleep apnea syndrome." (R. 277). She benefitted from the use of a continuous positive airway pressure machine. (R. 279).

On August 10, 2004, Plaintiff was once again evaluated by Dr. Breneman. (R. 266-269). Dr. Breneman noted that Plaintiff owed her credit union $10,000.00 in wage taxes. (R. 267). Plaintiff denied that she had delusions, hallucinations, phobias or obsessions, but she admitted that she sometimes became depressed. (R. 268). Dr. Breneman reported that Plaintiff was "free of any thoughts of harm to self or others," but that she was struggling with the fact that her daughter was growing older and would soon be an adult. (R. 268). Plaintiff was instructed to continue taking Depakote. (R. 269). Two months later, she indicated that she felt good, that she had been free of acute symptoms, and that she was considering filing for bankruptcy. (R. 264).

At the hearing, Plaintiff testified that she was born on May 16, 1953, that she lived with her 13-year old daughter, that she was separated from her husband, that she had a driver's license, and that she had driven herself to the hearing. (R. 38-39). She graduated from high school, obtained an Associate's Degree in Business Administration from Community College of McKeesport, and went back for a four-year advanced business administration program after being laid off. (R. 39). She testified that she had difficulty concentrating while trying to read articles or watch television shows. (R. 40-41). Plaintiff further testified that her work history included work as a clerical worker for two computer companies, as a deli clerk in a grocery store, as a census worker, as a day care worker, as a telemarketer, and as an office assistant for a social worker. (R. 42-47). She indicated that she was working as an office assistant at the time of the hearing, and that she generally worked 80-90 hours per month. (R. 44-47). She explained that Dr. Kerr was her primary care physician, that she continued to see Dr. Breneman every three months, and that she was seeing her therapist, Heather Crowe, every three weeks. (R. 47-48). Plaintiff was also seeing a chiropractor for pain in her neck and hip. (R. 48-49).

In response to a question posed by her attorney, Plaintiff explained that her supervisor at work was her cousin. (R. 49). Apparently, she was not expected to work full-time and was provided with other accommodations for her mental illness, given the familial relationship. (R. 51, 65). She testified that she had not worked full-time since before the passing of her father. (R. 54). Plaintiff further testified that she was able to shop for her household, attend her daughter's cheerleading events, and attend church on an occasional basis. (R. 57-58).

A vocational expert, Mark L. Heckman, also testified at the hearing. (R. 58). The ALJ asked Mr. Heckman to assume that a hypothetical individual with Plaintiff's age, education, training and work experience had no exertional impairments, but that she could perform only simple and routine work that involved no interaction with the public and only limited interaction with co-workers and supervisors. (R. 61). Given these limitations, Mr. Heckman testified that such an individual could not perform the jobs which Plaintiff had previously performed, since all of those jobs involved occasional interaction with the public. (R. 62). Nevertheless, Mr. Heckman proceeded to describe other jobs that such a person could perform, all of which existed in significant numbers in the national economy. These jobs included work as a stock inventory clerk, a house cleaner, a coupon redemption clerk, a flower picker and a dog bather. (R. 62). He further testified that, in the national economy, there were 41,847 stock inventory clerk positions, 133,487 house cleaner positions, 65,436 coupon redemption clerk positions, 40,432 flower picker positions, and 8,911 dog bather positions. (R. 62-63). He stated that, in Allegheny and Westmoreland Counties alone, there were 313 stock inventory clerk positions, 1,000 house cleaner positions, 492 coupon redemption clerk positions, 304 flower picker positions, and 67 dog bather positions. (R. 62-63). In response to a question posed by Plaintiff's counsel, Mr. Heckman testified that an individual who was thirty minutes late on a weekly basis would most likely be terminated. (R. 64-65).

The ALJ's findings were as follows:

1.   The claimant meets the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act, as amended, and is insured for benefits through the date of this decision.

2.   The Administrative Law Judge reserves a finding as to whether the claimant has

engaged in substantial gainful activity since December 31, 2000.

3.  The claimant has the following medically determinable "severe" impairments: sleep apnea, bipolar disorder and depression (20 CFR § 404.1520(c)).

4.  These medically determinable impairments do not meet or medically equal any of the listed impairments in Listings 3.00 Respiratory System or 12.00 Mental Disorders, or any other impairment listed in Appendix 1, Subpart P, Regulation No. 4.

5.  The undersigned has fully considered all of the medical opinions in the record regarding the severity of the claimant's impairments.

6.  The undersigned finds the claimant's allegations regarding her limitations not totally credible for the reasons set forth in the body of this decision.

7.  The claimant does not have any exertional limitations.  She retains the ability to perform a range of work that involves no more than simple, routine, repetitive tasks; no interaction with the public and limited interaction with supervisors or coworkers.

8.  The claimant is unable to perform any of her past relevant work and does not have any skills that could be transferred to other types of work within her residual functional capacity (20 CFR § 404.1565).

9.  The claimant was born on May 16, 1953 and was 47 years of age on December 31, 2000.  This is defined as a younger individual.  She is currently 51 years of age, which is defined as closely approaching advanced age (20 CFR § 404.1563).

10. The claimant has a high school education and three years of additional education at the college level (20 CFR § 404.1564).

11. Although the claimant's limitations do not allow her to perform the full range of heavy work, using Medical-Vocational Rule 204.00 in Appendix 2, Subpart P, Regulation No. 4 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform.  Examples of such jobs include medium work as a stock inventory clerk, with 313 jobs available locally and 41,847 nationally, or a house cleaner, with 1000 jobs available locally and 133,487 nationally.  Light work would include jobs as a coupon redemption clerk, with 494 jobs available locally and 65,436 nationally, a flower picker, with 304 jobs available locally and 40,432 nationally, or a dog bather, with 67 jobs available locally and 8,911 nationally.

12. The claimant was not under a "disability," as defined in the Social Security Act, as amended, at any time through the date of this decision (20 CFR § 404.1520(g)).

(R. 21-22).

## IV.   STANDARDS OF REVIEW

42 U.S.C. § 405(g) states that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive..."  In Rutherford v.

7

<u>Barnhart</u>, 399 F. 3d 546 (3d Cir. 2005), the U.S. Court of Appeals for the Third Circuit defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Rutherford</u>, 399 F. 3d at 552. In this regard, substantial evidence is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence." <u>Rutherford</u>, 399 F. 3d at 552. This Court has no mandate to re-weigh the evidence or to substitute its own conclusions for those of the fact-finder. <u>Rutherford</u>, 399 F. 3d at 552.

When resolving the issue of whether a claimant is disabled and therefore entitled to DIB, the Commissioner uses a five-step sequential evaluation process. The U.S. Supreme Court recently summarized this five-step process as follows:

> "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c)."

<u>Barnhart v. Thomas</u>, 540 U.S. 20, 24-25 (2003) (footnotes omitted).

## V.    Discussion

Plaintiff's first contention is that the ALJ failed to consider her mental illness on a longitudal basis. (Br. for Plaintiff 11-13). More specifically, Plaintiff asserts that the ALJ wrongfully failed to give controlling weight to the opinions of her treating physicians regarding her work-related limitations, discounted the consistent longitudal opinions of her treating physicians regarding her decline into mental illness, and failed to provide adequate reasons for rejecting the opinions of her treating physicians. (Br. for Plaintiff 11-13). The problem with Plaintiff's argument is that it begs the question. Plaintiff fails to convey what opinions were actually expressed by her treating physicians. As the Commissioner points out, "there was no

specific 'disabled' opinion for the ALJ to ignore." (Br. for Defendant 9).

Plaintiff cites several precedents in support of her position that the Commissioner was required to give controlling weight to the opinions of her treating physicians. Three of those precedents are noteworthy for purposes of the instant case. In Fargnoli v. Massanari, 247 F. 3d 34 (3d Cir. 2001), the U.S. Court of Appeals for the Third Circuit concluded that the ALJ had failed to adequately explain why the opinions of the claimant's treating physicians were rejected. Nonetheless, in that case, one of the claimant's treating physicians had specifically opined that the claimant was unable to work as of the last date on which he was insured for benefits. Fargnoli, 247 F. 3d at 37. In Morales v. Apfel, 225 F. 3d 310 (3d Cir. 2000), the Court of Appeals determined that the ALJ had wrongfully rejected the opinions of the claimant's treating physicians without relying on conflicting medical evidence. In that case, however, a physician who had treated the claimant for three years had determined that the claimant was "markedly limited in a number of work-related activities." Morales, 225 F. 3d at 318. In Rocco v. Heckler, 826 F. 2d 1348 (3d Cir. 1987), the Court of Appeals likewise decided that the ALJ had inappropriately dismissed the findings of the claimant's treating physicians. Nevertheless, in Rocco, a physician who had treated the claimant for over twenty years specifically stated that the claimant was "totally incapable of holding down full time employment in any type of occupation," and that he was "totally and permanently disabled from any type of gainful employment." Rocco, 826 F. 2d at 1349. Unlike the situations in these and the other cited cases, the instant case does not present the questions of whether, when, and to what extent, an ALJ may reject the opinion of a claimant's treating physician that the claimant is disabled. In this case, no coherent opinion or conclusion on the ability or inability of Plaintiff to engage in substantial gainful activity has been expressed by her treating physicians.

To support her assertion that Dr. Breneman and Dr. Millward found Plaintiff to be "severely disabled due to bipolar disorder," Plaintiff relies on three separate psychiatric evaluation reports. (Br. for Plaintiff 11). The first report was prepared by Dr. Breneman on January 29, 1996. (R. 160-161). This report, which was completed while Plaintiff was hospitalized, sheds absolutely no light whatsoever on Dr. Breneman's opinion as to whether

9

Plaintiff was capable of substantial gainful activity. Even if the record of this evaluation did contain an expressed opinion regarding Plaintiff's residual functional capacity, this report was completed almost six years before the alleged onset of Plaintiff's disability. There is "a distinction between the issue of the existence of a medical condition and the issue of the existence of statutory disability." Kuzmin v. Schweiker, 714 F. 2d 1233, 1237 (3d Cir. 1983). It is clear that Plaintiff has been suffering from a severe medical condition for a long period of time. The question before the ALJ, however, was whether that condition was disabling.

The second report relied upon by Plaintiff was prepared by Dr. Millward on January 20, 2003. (R. 173-175). Even though Dr. Millward noted that Plaintiff was working in a clerical position and was "in the process of applying for social security disability," he expressed no opinion regarding her ability to work. (R. 174). He did record, however, that Plaintiff had described no "current stressors" during the interview. (R. 174).

The third report relied upon by Plaintiff was prepared by Dr. Breneman on August 10, 2004. (R. 266-269). In this report, under "Axis IV," Dr. Breneman listed three "stressors," including notations that Plaintiff was in "chronic financial distress," that she was "only capable of working part time," and that she was "again applying for social security disability." (R. 268). The Commissioner contends that Dr. Breneman was simply reporting what Plaintiff had relayed to him, rather than stating his own conclusion that Plaintiff was only capable of part-time work. (Br. for Defendant 9, n. 4). Based upon a review of the evidence and an evaluation of the context of these statements, the Court agrees with the Commissioner. The Axis IV notations do appear to reflect Plaintiff's comments to Dr. Breneman rather than Dr. Breneman's own observations. After all, the fact that Plaintiff was in "chronic financial distress" was certainly not something that Dr. Breneman could have discovered on his own. The same was true with regard to Plaintiff's application for disability benefits. Furthermore, in Dr. Millward's January 20, 2003, Axis IV report, he noted that "[n]o current stressors were described during [that day's] interview." (R. 174). Consequently, the Court finds that the language in the Axis IV portion of Dr. Breneman's August 10, 2004, report was a reiteration of Plaintiff's revelations and not an expression of Dr. Breneman's own opinion. To the extent that Plaintiff argues that the ALJ

failed to explain his reasons for discounting the opinions of Plaintiff's treating physicians, the Court finds that there were no opinions expressed by these physicians which were in conflict with the findings of the ALJ. (R. 11).

Even if Dr. Breneman or Dr. Millward had expressed the view that Plaintiff was only capable of working on a part-time basis, such an opinion would not necessarily be dispositive. Controlling weight is given to "a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairments" only where that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(d)(2). Under 20 C.F.R. § 404.1527(e)(1), "[t]he ultimate decision concerning the disability of a claimant is reserved for the Commissioner." Knepp v. Apfel, 204 F. 3d 78, 85 (3d Cir. 2000). Furthermore, even if the Commissioner had determined that Plaintiff was only capable of performing part-time work, she would not have been automatically entitled to disability benefits. Congress has delegated to the Commissioner the authority to "prescribe the criteria for determining when services performed or earnings derived from services demonstrate an individual's ability to engage in substantial gainful activity." 42 U.S.C. § 423(d)(4)(A). Pursuant to this authority, the Commissioner has promulgated 20 C.F.R. § 404.1527(a), which clearly states that "work may be substantial even if it is done on a part-time basis." In the instant case, the ALJ noted that Plaintiff's earnings in 2003 exceeded the substantial gainful activity guidelines. (R. 16). For all of these reasons, Plaintiff's first argument is clearly without merit.

Plaintiff's second argument is that the ALJ erred in failing to "consider the impact of Plaintiff's repeated hospitalizations on her ability to perform work on a sustained basis." (Br. for Plaintiff 13). This contention need not detain the Court for long. The ALJ specifically noted that "[t]he claimant has not required hospitalization since 1996." (R. 18). He also stated that Plaintiff had submitted no evidence of her 1991 and 1993 hospitalizations. (R. 18). Plaintiff cites Rocco v. Heckler, 826 F. 2d 1348 (3d Cir. 1987), for the proposition that a claimant's need for frequent hospitalization must be considered by the ALJ. (Br. for Plaintiff 15). In Rocco, however, the claimant was hospitalized multiple times throughout his alleged period of disability.

11

Rocco, 826 F. 2d at 1349-1350. It is true that the Court of Appeals determined that evidence of three hospitalizations that occurred subsequent to the expiration of the claimant's insured eligibility period was "helpful in evaluating the claimant's actual condition before the end of [that period]." Rocco, 826 F. 2d at 1351. Nevertheless, in the instant case, there was a span of almost six years between Plaintiff's last hospitalization and her alleged onset of disability. Consequently, evidence of Plaintiff's hospitalizations are of minimal probative value. In any event, the ALJ adequately considered Plaintiff's 1996 hospitalization, despite Plaintiff's inexplicable assertion to the contrary. (R. 18, Br. for Plaintiff 13-15). Plaintiff's second contention is wholly without merit.

Plaintiff's third argument is that the ALJ erred in concluding that the degree of limitation alleged by Plaintiff was not supported by the totality of the evidence. (Br. for Plaintiff 16). She relies on Williams v. Sullivan, 970 F. 2d 1178 (3d Cir. 1992), in which the Court of Appeals stated that "[o]nce a claimant has submitted sufficient evidence to support his or her claim of disability, the Appeals Council may not base its decision upon mere disbelief of the claimant's evidence." Williams, 970 F. 2d at 1184-1185. The Court is convinced that the ALJ properly relied on countervailing evidence in order to reach his conclusion. He relied on the opinion of a state agency medical consultant, Dr. Zuckerman, to determine that Plaintiff's impairments did not meet or equal an impairment listed in Appendix 1, Subpart P, Regulation No. 4. (R. 16). The ALJ observed that her sleep apnea had been improved by her use of a continuous positive airway machine, that she had been able to do housework when she felt the need to do so, and that she had been active as a cheerleading coach for her daughter's squad. (R. 17). In finding that Plaintiff was not disabled, the ALJ relied on the very treatment notes that Plaintiff now claims were ignored. For instance, the ALJ pointed out that, in October, 2004, "the claimant was determined to be free of any active symptoms of bipolar disorder or depression." (R. 19). Despite Plaintiff's assertion that she suffered from panic attacks, the record of her treatment notes failed to confirm that. (R. 19). All of these factors were considered by the ALJ, who ultimately concluded that the totality of the evidence supported a finding that Plaintiff did not have any exertional limitations, and that her non-exertional limitations were not disabling. (R.

12

19-22).

It is clear that, where there is conflicting evidence in the record, an ALJ may reasonably find that a lack of clinical data to support the testimony of a claimant and the assertions of his or her treating physicians constitutes substantial evidence that the claimant is not disabled. Newhouse v. Heckler, 753 F. 2d 283, 286 (3d Cir. 1985). As the Commissioner points out, "the State agency's medical consultant can be considered 'conflicting and internally contradictory evidence' which warrants not giving a treating source's opinion 'controlling' weight." (Br. for Defendant 10), citing Jones v. Sullivan, 954 F. 2d 125, 129 (3d Cir. 1991). This Court has no mandate to re-weigh the evidence in this case. Congress has clearly provided that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive..." 42 U.S.C. § 405(g). Stripped to its core, Plaintiff's argument is nothing more than an appeal to the Court to re-weigh the evidence. Given the clear mandate from Congress that judicial review of the Commissioner's determination is to be circumscribed, this Court is constrained to defer to the findings of the ALJ in this case.

Plaintiff's fourth argument is that the ALJ erred in discounting the testimony of the vocational expert elicited by questions posed by Plaintiff's counsel. (Br. for Plaintiff 17). The two questions posed by Plaintiff's counsel to Mr. Heckman centered on Plaintiff's alleged inability to maintain a schedule. (R. 64-65). Mr. Heckman testified that an employee who was habitually late for work would be terminated by his or her employer, regardless of the type of job at issue. (R. 64). He stated that an employee who was thirty minutes late on a weekly basis would most likely not be retained. (R. 64-65). The ALJ did not find the limitation implied by the attorney's questions "to be credible or consistent with the clinical and objective findings of record." (R. 20). Apparently, the ALJ was not convinced that Plaintiff's impairments had impeded her ability to arrive for work at a scheduled time. In her brief, Plaintiff provides no reasons why her non-exertional limitations prevented her from sticking to a schedule. (Br. for Plaintiff 17-18). Instead, she asserts that the ALJ failed to account for all of her non-exertional limitations. (Br. for Plaintiff 17-18). A review of the ALJ's opinion, however, confirms that he did consider all of Plaintiff's non-exertional limitations.

13

In <u>Rutherford v. Barnhart</u>, 399 F. 3d 546 (3d Cir. 2005), the Court of Appeals made it clear that an ALJ may reject a proposed occupational limitation that is either lacking in "objective medical support" or "contradicted by other evidence in the record." <u>Rutherford</u>, 399 F. 3d at 554. Where the hypothetical question submitted to the vocational expert includes "all of the limitations credibly established by the record," the ALJ is "entitled to rely upon the vocational expert's responses as substantial evidence" for his determination at the fifth stage of the sequential evaluation process. <u>Rutherford</u>, 399 F. 3d at 555. Plaintiff's generalizations about her non-exertional limitations provide no specific support for the limitation implied by her attorney's questions to Mr. Heckman. (Br. for Plaintiff 17-18). Accordingly, it was proper for the ALJ to reject that limitation and to rely on Mr. Heckman's testimony as substantial evidence that Plaintiff was not disabled.

Plaintiff's fifth and final argument is that the ALJ erred in failing to consider a closed period of disability from December 31, 2000, through April 1, 2002. (Br. for Plaintiff 18-19). Although the Commissioner points out that Plaintiff made no such request of the ALJ at the hearing, the record indicates that Plaintiff did raise this issue before the Appeals Council. (Br. for Defendant 18; R. 281). Plaintiff cites to no authority requiring an ALJ to consider such a closed period of disability subsequent to a determination that a claimant was not disabled for the entire period for which benefits were initially sought. It is, of course, true that the ALJ considered Plaintiff's job when he chose to reserve "a finding as to whether the claimant has engaged in substantial gainful activity since December 31, 2000." (R. 16). Nevertheless, Plaintiff's case did not end at the first stage of the sequential evaluation process. (R. 21-22). It was at the fifth step that the ALJ determined that Plaintiff was not disabled. (R. 22). Consequently, the ALJ's determination that Plaintiff's earnings in 2003 exceeded the substantial gainful activity guidelines was not dispositive in this case. (R. 16). In any event, the ALJ's finding that Plaintiff was not under a disability "at any time through the date of [his] decision" precluded a contrary finding that she had been under a disability during the proposed "closed period of disability." (R. 22). Plaintiff's argument is flawed in that it seeks to place more weight on a hospitalization that occurred almost six years before the alleged onset of disability than it

14

does on gainful activity engaged in by Plaintiff immediately after the alleged closed period of disability.

## VI.    Conclusion

Based on a thorough review of the record, the Court concludes that the final decision of the Commissioner is based on substantial evidence for purposes of 42 U.S.C. § 405(g). Accordingly, the Commissioner's motion for summary judgment shall be granted and Plaintiff's motion for summary judgment shall be denied.  An appropriate order will follow.

June 12, 2006

David Stewart Cercone
United States District Judge

cc:    Barbara A. Artuso, Esquire
       550 East Pittsburgh Street
       Greensburg, PA 15601

       Lee Karl
       Assistant United States Attorney